BOARD OF COMMISSIONERS OF DELAWARE COUNTY *v.* BRUCE BRIGGS.

[No. 1-1074A164. Filed December 3, 1975. Rehearing denied January 20, 1976. Transfer denied June 22, 1976.]

*Albert C. Harter, Thomas R. Hunt, Kiley, Osborn, Kiley, Harker & Rogers,* of Marion, for appellant.

*W. Scott Montross, Townsend, Hovde & Townsend,* of Indianapolis, for appellee.

LOWDERMILK, J.—Plaintiff-appellee Bruce Briggs (Briggs) obtained a judgment in the trial court below against defendant-appellant Board of Commissioners of Delaware County (County) for the County's alleged negligence in failing to adequately warn Briggs of the dangerous condition of a "Y" intersection on the county roads of Delaware County.

The County raises the following seven issues on this appeal:

   I.  Whether the County is immune from tort liability in this case.

  II.  Whether certain instructions given to the jury were proper.

III.  Whether an instruction on "sudden emergency" was properly tendered to the jury.

IV. Whether the trial court erred when it admitted certain photographs as rebuttal evidence.

V. Whether the trial court erroneously denied the County's motions for judgment on the evidence.

VI. Whether the jury's verdict is contrary to law, contrary to the evidence, or not supported by sufficient evidence upon all the necessary elements.

VII. Whether the damages awarded by the jury are excessive.

## FACTS

An examination of the facts most favorable to Briggs reveals the following:

Bruce Briggs was involved in an accident on a dark, cloudy night at the intersection of Delaware County Roads 500E and 430N. He was enroute to a friend's house on his Triumph 650 cc motorcycle. He had never been on this particular stretch of road before, and had slowed the motorcycle down to 40-45 miles per hour while looking ahead and to the right for the turnoff he had been directed to by his friend (the speed limit was 65 miles per hour). The headlight was on low beam because the road had dips, ruts, holes and bumps, and Briggs estimated it illuminated down the road approximately 85-100 feet.

As Briggs came over a slight rise he saw that the road suddenly ended 90 feet ahead. He applied his brakes, steered straight through a large patch of loose gravel in the middle of the intersection, and overturned the bike in a ditch at the end of the road, which acts resulted in severe injuries. A passing motorist saw the light in the ditch, and notified police. Briggs testified that he saw no signs at the intersection, nor did he have any kind of warning that the road did not continue straight ahead.

The road at this point splits into two parts, with one arm of the "Y" gently curving off to the left, and the other arm

turning more sharply to the right. A 25 foot triangular patch of heavy gravel covered a center portion of the intersection where traffic would not normally be expected to travel because of the split in the road to each side.

The investigating officer found a double-arrow sign laying in the ditch at the end of the intersection where Briggs ran off the road. The officer's investigation of the approach to the intersection found that there were no posted warnings of any kind in the area.

One witness who lived 75 yards from the intersection testified at trial that he traveled the road at least twice a day. He said that the sign on the approach to the intersection had been gone at least a month before the accident, although the post itself was still there. He testified as to no other signs.

Another witness at trial testified that she had gone through the intersection two or three times a week for a period of six weeks before the accident, and at no time did she see any signs at the intersection. The defendant's witnesses testified, in apparent contradiction, to several different types of signs at the intersection on the day before the crash.

## I.

The County first contends that the court below committed an uncorrected error of law when it instructed the jury that the County was not entitled to governmental immunity. It claims that the verdict of the jury is contrary to the law and to the evidence and is not supported by sufficient evidence in that the County should be entitled to governmental immunity inasmuch as its negligent acts, if any, were done solely in the discretionary exercise of its police powers as an inherent governmental function and it breached no private duty to Briggs.

The doctrine of sovereign immunity has been in an unsettled state in Indiana despite the Supreme Court's decision in Campbell v. State (1972), 259 Ind. 55, 284 N.E.2d 733.

There, the Court finally abolished the governmental-proprietary distinction for state tort immunity after a long series of cases had gradually abrogated the general sovereign immunity doctrine. See Note, *Sovereign Immunity in Indiana-Requiem?*, 6 IND. L. REV. 92 (1972).

The *Campbell* case, however, raised a new problem for the courts faced with a sovereign immunity claim, inasmuch as the Court specifically held that there were still *some* acts that may be protected by the sovereign immunity doctrine. The specific passage follows in full:

"We do not mean to say by this opinion that all governmental units can be held liable for any and all acts or omissions which might cause damage to persons. For example, one may not claim a recovery because a city or state failed to provide adequate police protection to prevent crime. *Simpson's Food Fair, Inc.* v. *City of Evansville* (1971), [149] Ind. App. [387], 272 N.E.2d 871, Transfer denied. Nor may one recover damages because a state official made an appointment of an individual whose incompetent performance gives rise to a suit alleging negligence on the part of the state official for making such an appointment. Likewise the United States Supreme Court has recognized a judicial immunity. *Pierson* v. *Ray* (1967), 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288. On this subject matter Professor Prosser, in his treatise, stated the following:

" 'At the very outset it was more or less obvious that some vestige of the governmental immunity must be retained. It was, for example unthinkable that either state (or) a municipality should be held liable for a wrong decision of its courts, for an erroneous evaluation of property by a tax assessor. In several of the decisions abrogating the immunities, there was language used which reserved the possibility that there might still be immunity as to "legislative" or "judicial" functions, or as to acts or omissions of government employees which were "discretionary." ' Prosser, Law of Torts Sec. 131, at 986 (4th ed. 1971.)

"Therefore, it appears that in order for one to have standing to recover in a suit against the state there must have been a breach of duty owed to a private individual." 259 Ind. 55, 284 N.E.2d at 733.

In the case at bar; the County claims that it falls within this exception in that it owed no private duty to Briggs, since its placement and maintenance of signs at the intersection in question was an exercise of a purely discretionary function. It appears the problem has not been directly dealt with in any subsequent interpretation of *Campbell,* and thus we are left with the task of interpreting that Supreme Court opinion in order to delineate the bounds of protection presently afforded to the state and its subdivisions by the doctrine of sovereign immunity.

In *Campbell,* the Supreme Court held:

"Finding no basis for the continuation of the doctrine of sovereign immunity as applicable to the state any more than it is applicable to municipal corporations and counties, we hold that such a defense by the state is not available to any greater extent than it is now available to municipal corporations and counties of this state." 259 Ind. 55, 284 N.E.2d at 733.

Since it is by no means clear to what extent sovereign immunity was available to counties before this decision, we are left with several alternatives. The County argues that the court has here held that a certain degree of sovereign immunity that had been taken away in previous court decisions is now to be given back to municipal corporations and counties as a result of the holding in *Campbell.* Briggs has countered in his brief that such is not the case, that sovereign immunity has been completely abolished as to the county, and that although the *Campbell* court recognized certain vestiges of the rule as applied to state tort immunity, there is *no* immunity remaining for the counties under previous case law interpretations.

Neither position is totally correct. It is apparent that the court is recognizing that certain *personal* immunities, e.g., judicial immunity, legislative immunity, etc., have not been abrogated by either the holding in *Campbell* or by previous cases. This *personal* immunity will

still be available in the appropriate situations. However, we believe the real basis for the liability of the state or the counties is actually the theory of respondeat superior, see *Note, Sovereign Immunity in Indiana-Requiem?*, 6 IND. L. REV. 92 (1972); *Driscol* v. *Delphi Community School Corp.* (1972), 155 Ind. App. 56, 290 N.E.2d 769, 770 at n. 1, and it must follow that, if the servant is personally immune from liability, the state must also be immune from liability. *Creelman* v. *Svenning* (1966), 67 Wash.2d 882, 410 P.2d 606.

Thus, liability should be determined by the standards previously utilized in ascertaining the personal liability or immunity of governmental employees.

While the respondeat superior-governmental immunity formulation had not been specifically relied upon by the courts in those examples cited by the *Campbell* court, we believe these principles to be the true basis of those decisions, and that the *Campbell* court intended this result.

Having decided that the "remaining vestige" of sovereign immunity forecasted in the *Campbell* case is dependent upon and co-extensive with the personal governmental immunity above referred to, we now seek to further interpret the language in *Campbell* that refers to "discretionary" functions and the public duty/private duty dichotomy.

The court in *Campbell* quotes from Dean Prosser's work that sovereign immunity remains for acts or omissions of government employees which are "discretionary" in nature. We believe that this is a reference to the generally established requirements for personal governmental immunity protection. The three requirements traditionally recognized as necessary in order for personal governmental immunity to apply are: (1) the agent's action must have been undertaken in the performance of a discretionary rather than a ministerial function; (2) the action must have been within the scope of the agent's employment; and (3) the action must have been undertaken in good faith. *See*

Note, *Sovereign Immunity in Indiana-Requiem?*, 6 IND. L. REV. 92, 104 (1972). Thus, the reference to "discretionary" acts seems to be a reference to the test for the application of the personal immunity doctrine. In addition, the court refers to the United States Supreme Court case of *Pierson* v. *Ray, supra,* which was a case upholding *personal* judicial immunity.

We conclude that the apparent exception to the abolishment of sovereign immunity that the *Campbell* court refers to is nothing more than a reference to the state tort immunity that results if a claim of respondeat superior liability is asserted against the State in a case where the servant himself is not liable because of the protection of a personal governmental immunity. The court is simply declining to hold the State liable for the acts of its agents where the agent himself is not liable for his own acts. To ask the State to assume liability in cases where its agents are not liable would be a dangerous precedent, and one which this court will not set.

Further confusion arises from the *Cambpell* case because of the closing sentence in the above quoted section of the opinion where the court, in apparent reference to Prosser's ministerial-discretionary distinction, holds that ". . . it appears that in order for one to have standing to recover in a suit against the state there must have been a breach of a duty owed to a private individual." The question presented here is whether this is an additional test that must be met by the plaintiff over and above a showing that the act of the agent was performed in the exercise of a ministerial action rather than a discretionary action, or whether the court is simply using different words to restate the one basic test. See Foust, *Torts, 1974 Survey of Indiana Law,* 8 IND. L. REV. 264, 276 (1974).

We note initially that there seems to be no easy way of determining what is a private duty or what is a public duty.

Certain previous cases that relied on the distinction had fact situations such that the case was clearly within one or the other of these respective categories, and as such did not present difficult borderline situations like the case at bar. *Compare Simpson's Food Fair, Inc., supra,* with *Scott County School Dist. 1* v. *Asher* (1974), 160 Ind. App. 299, 312 N.E.2d 131, 138, and *Roberts* v. *State* (1974), 159 Ind. App. 456, 307 N.E.2d 501. Nor does any one test thus far formulated appear broad enough to deal with the variety of situations that commonly arise. Further, the statement by the court in *Campbell* is phrased in terms of standing, which usually does not raise an issue like the duty owed by the defendant at the initial stage of the inquiry. It is also not clear whether the court is referring to some general private duty test that must be met to escape the application of the sovereign immunity doctrine, or whether they are referring to the specific duty that must be shown as a matter of law in every negligence case. *See generally, Miller* v. *Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701.

After careful consideration, we have concluded that the court's reference to "private duty" is a reference to the fact that if there is *only a public duty owed,* then the acts performed in furtherance of that public duty are usually those kinds of acts which are traditionally termed "discretionary." When that is the case, the public servant is protected by the personal immunity doctrine, and the state is in turn protected from any respondeat superior liability. *See generally, Roberts* v. *State, supra.* Conversely, it is only necessary for the plaintiff to show that a private duty was owed to him, whether or not the agent was engaged in an act committed to the discretion of his office. This is implicit in two recent decisions of this court, *Roberts* v. *State, supra,* and *Scott County School Dist. 1* v. *Asher, supra.* In both cases, a determination that a private duty was owed was considered dispositive of the issue of sovereign immunity, and no further inquiries were made into claims that the agents

of the State were acting within their discretionary powers. We conclude that the State is immune from liability *only if the agent is exercising his governmental discretion in the performance of a purely public duty.*

This formulation appears to coincide with the exceptions to liability set out in the new Tort Claims Act passed by the Indiana Legislature on February 19, 1974, and codified at IC 1971, 34-4-16.5 (Burns Supp. 1975). See, Foust, *Torts, 1974 Survey of Indiana Law,* 8 IND. L. REV. 264 (1974). While this court has recently held that that act applies prospectively only, *State* v. *Daley* (1975), 165 Ind. App. 513, 332 N.E.2d 845, and thus has no direct effect on the case at bar, we note with interest the comments of Dean Foust regarding the new law:

> "A major provision of the Act states that a governmental entity or employee is not liable for losses resulting from certain conditions of land, the initiation of judicial or administrative proceedings, *the performance of discretionary functions,* the enforcement of or failure to enforce a law, or an act or omission performed under the apparent authority of an invalid statute if liability would not have attached had the statute been valid. These standards, with the exception of those relating to conditions of land, were previously utilized by the courts to immunize state employees, acting within the scope of their authority, from personal tort liability.[79] *Accordingly, the doctrine of respondeat superior is now the touchstone of state liability.* The state, in its capacity as master, is immune from liability in the same situations in which state employees were immune from personal tort liability at common law. However, since the respondeat superior approach was first suggested by the *Campbell* court, the Act does little more than codify existing case law."

\* \* \*

"79 *See, e.g., Wallace* v. *Feehan,* 206 Ind. 522, 190 N.E. 438 (1934) (discretionary-ministerial distinction) ; *Saloom* v. *Holder* [(1973), 158 Ind. App. 177], 304 N.E.2d 217 (unconstitutional statute) ; Note, *Sovereign Immunity in Indiana-Requiem?,* 6 IND. L. REV. 93, 102-05 (1972.)" (Our emphasis.) 8 IND. L. REV. at 274-75.

The Act phrases the test in terms of "performance of a discretionary function," which is clearly a narrower definition than the use of the general term "discretionary," and in fact appears to be the same test as we have set out above.

In the case at bar, we have determined that the agents of the County were acting in a purely ministerial way, and thus the defense of sovereign immunity is not available.

We need not determine whether the agents of the County were exercising their discretion in the initial decision to place the signs at this intersection, since the act of negligence alleged here was the failure to maintain the signs after they were erected. The act was ministerial in nature, rather than discretionary, under the well settled Indiana rule. In *Adams* v. *Schneider* (1919), 71 Ind. App. 249, 124 N.E. 718, the court said:

> "A duty is discretionary when it involves on the part of the officer to determine whether or not he should perform a certain act, and if so in what particular way, and in the absence of corrupt motives, in the exercise of such discretion, he is not liable. His duties, however, in the performance of the act, after he has once determined that it shall be done, are ministerial, and for negligence in such performance, which results in injury, he may be liable in damages." *Id.* at 255, 124 N.E. at 720.

The *Adams* holding was recently reaffirmed by this court in *Snyder* v. *Mouser* (1971), 149 Ind. App. 334, 272 N.E.2d 627.

Here, it is conceded that the County had placed warning signs on the approach to the intersection several years before the accident in question. Once the decision was made to place the signs at the intersection, the subsequent placement and maintenance of the signs was a purely ministerial act on the part of the County. It was the negligent maintenance of such signs that led to Briggs' action in this case, and on that basis, the County was not protected by the doctrine of sovereign immunity.

· We have further reason to believe that we have reached the correct result in the case at bar by the very nature of the *Campbell* decision itself. An examination of facts in *Campbell* reveals that that plaintiff was suing the State for injuries received in a head-on collision allegedly resulting from the State's negligent failure to mark a highway with a yellow line and install a no passing sign where it was unsafe to pass. In view of the court's later statement that the State was liable under the sovereign immunity doctrine to the same extent that cities and counties are liable, it seems improbable that the *Campbell* court could have intended that the "last vestige" of sovereign immunity would be so broad as to protect common negligence in city and county highway departments. We thus hold that the doctrine has no application in the case at bar.

## II.

The County next challenges certain instructions that were read to the jury. Instruction No. 9 provided:

> "You are instructed that at the time of the accident herein complained of statutes of the State of Indiana, insofar as pertinent, provided as follows:
>
> 'The board of county commissioners of any county of any two (2) counties, acting jointly, may employ a full-time county highway engineer who shall be responsible for the supervision of the design, construction, planning, traffic, and other engineering functions of the county highway department under the policies and directions established by the board, and who shall prepare or cause to be prepared all surveys, estimates, plans and specifications which are required.' (8-17-5-1)
>
> and
>
> 'In the discharge of his official duties, the county highway engineer shall, subject to the policies established by the board of county commissioners, perform the following functions: . . .
>
> '(h) Traffic Safety Program. Develop a county-wide program of traffic safety that will provide for traffic control signs . . .' (8-17-5-6)
>
> If you find from a preponderance of the evidence the

defendant County failed to implement such a program of traffic safety at the intersection of Roads 500 E and 430 N, then you may consider such fact in determining whether or not the defendant County exercised reasonable and ordinary care in this case."

The County contends on appeal that the giving of said instruction was error because it incorrectly stated the law, it contained no explanation of the application of the quoted statutes to the issues of the case, it misled and confused the jury, and finally it was not, as a whole, relevant to the issues and the evidence in that the instruction told the jury to consider whether the County breached a statute in its determination of the County's negligence when, in fact, violation of said statute was not negligence nor within the issues or evidence of the case. The County relies on the case of *Board of Commissioners of Miami County v. Klepinger* (1971), 149 Ind. App. 377, 273 N.E.2d 109.

The County contends that Instruction No. 9 erroneously creates an absolute duty on the part of the County so that the jury was in effect instructed that a violation of the quoted statutes amounted to negligence per se. We do not agree that the instruction in question is a negligence per se instruction, or that the *Klepinger* case requires reversal of the case at bar.

The *Klepinger* case held that the statutes contained within the instruction in that case did not create an absolute duty on the part of the County such that a violation of the statutes was negligence per se. The jury had been instructed that if they found the defendant guilty of violating the statutes, then the defendant was automatically guilty of negligence. The court held that such an instruction was proper only when an absolute duty was created by the statute, and that the use of the term "violation" in the instruction implied that such an absolute duty was present, when in fact it was not.

In the case at bar, we note initially that the instruction does not contain the word "violated." The *Klepinger* court

was particularly concerned with the use of that word because they felt it conveyed the idea of negligence per se to the jury when in fact it was not an issue in the case. The County claims that the language used in Instruction No. 9 is equivalent to the term "violated," but we cannot agree. The instruction is phrased in terms of failing to implement the traffic safety program at a particular intersection, and if that fact is found, the jury may consider such fact in determining if ordinary care was exercised. This is exactly the way the instruction should be put to the jury according to the court in *Klepinger*. There the court quoted with approval the case of *Swoboda* v. *Brown* (1935), 129 Ohio St. 512, 196 N.E. 274, for an explanation of the distinction that we think is controlling in the case at bar:

> "The distinction between negligence and 'negligence per se' is the means and method of ascertainment. The first must be found by the jury from the facts, the conditions, and circumstances disclosed by the evidence; the latter is a violation of a specific requirement of law or ordinance; the only fact for determination by the jury being the commission or omission of the specific act inhibited or required.

> "Where a specific requirement is made by statute and an absolute duty thereby imposed, no inquiry is to be made whether the defendant acted as a reasonably prudent man, or was in the exercise of ordinary care. In such a situation, the obligation and requirement has been fixed and established by law, and the conduct of any person which is violative of such specific statutory requirement is illegal, and, if it proximately results in injury to one to whom a legal duty is owed, the transgressor is liable for the resulting damage. In such case, the jury is not called upon to determine whether the conduct constituted negligence; it determines only whether the act prohibited was committed or the act required by law was omitted, as the case may be. *The violator of such specific requirement of law is liable, irrespective of the question as to whether his act is such as is deemed to meet and satisfy the test of ordinary or reasonable care which would be applied in the absence of such statutory definition and imposition of absolute duty,* such as, for instance, the absolute and specific requirement as to headlights. Where the standard of duty is thus fixed and absolute, it becomes the same under all circumstances,

the failure to observe that requirement is clearly negligence per se. *But, where duties are undefined, or defined only in abstract or general terms, leaving to the jury the ascertainment and determination of reasonableness and correctness of acts and conduct under the proven conditions and circumstances, the phrase 'negligence per se' has no application."* (Our emphasis.)

The court in *Klepinger* went on to hold:

"If the Miami County Commissioners are responsible under this statute for their decision to open the highway, the standard of conduct applied must be the common law standard of due care of a reasonably prudent person. There is no specific act, no specific requirement or any absolute duty set out in the statute to be 'violated.' Therefore, the Commissioners are not liable as a matter of law or negligent per se. Any negligence would have to be shown from all of the facts and circumstances of this particular case to determine whether a reasonably prudent man would have made such a judgment." 149 Ind. App. 377, 273 N.E.2d at 109.

Thus, the court there implies that for the governmental unit to be liable under a statute like the one in that case (explaining when a road should be closed) the agent must have breached the common law standard of due care of a reasonably prudent person operating under that statutory authority. While the statute cannot be "violated" as a matter of law, the jury does have a right to consider whether the defendant used the due care that a reasonably prudent person would use in fulfilling the requirements of the statute. If such a breach is found by the jury, and that breach was the proximate cause of plaintiff's injuries, then the defendant can be held liable.

We find support for this conclusion in Prosser, *Law of Torts,* Sec. 36 at 201 (4th ed. 1971):

"If the statute is not construed to cover the plaintiff, or the particular type of harm, many courts have held that its violation is not even evidence of negligence, and can have no effect on liability at all. Obviously such a result is called for in the case of such statutes as the Sunday blue laws, which do not purport to protect any-

one, or to set any standard of care. But the existence of a statute does not prevent an action for common law negligence; and *where the statute does set up standard precautions, although only for the protection of a different class of persons, or the prevention of a distinct risk, this may be a relevant fact, having proper bearing upon the conduct of a reasonable man under the circumstances, which the jury should be permitted to consider. There is, in other words, a statutory custom, which is entitled to admission as evidence.* . . . The arbitrary classification of all breaches of statute as negligence per se or no negligence at all leaves too little flexibility for the standard of reasonable care." (Our Emphasis.)

We hold that Instruction No. 9 does not constitute a negligence per se instruction, but rather, is an instruction on the standard of care that the jury should consider along with all of the other evidence in determining whether the County was liable for this injury. The giving of said instruction was not contrary to law.

The County claims that the instruction contained no explanation of the application of the quoted statutes to the issues of the case. However, the instruction specifically stated that if the jury found that the County failed to implement a traffic safety program *at this particular intersection,* then such fact may be considered in determining whether the County exercised reasonable and ordinary care. "Reasonable and ordinary care" was specifically defined in Instruction No. 6, and it is axiomatic that instructions must be construed as a whole. *Perry v. Goss* (1970), 253 Ind. 603, 255 N.E.2d 923. Contrary to the County's contention, these instructions are not contradictory, but rather supplement each other as is typical of many Pattern Jury Instructions.

The County claims that they were not required to hire a county highway engineer, that the statutes quoted were purely discretionary, that no duty was created, and thus the County could not be held liable for any breach of the statute. It was agreed by all that the County did indeed hire a traffic engineer. Having done so,

the statute states that the engineer "shall . . . develop a county-wide program of traffic safety that will provide for traffic control signs." If the jury found that the engineer failed to implement such a program at this intersection, they could consider such failure in determining whether he exercised reasonable and ordinary care. We do not feel that Instruction No. 9 misled or confused the jury, nor did it misstate the law.

Finally, the County contends that said instruction was not relevant to the issues or the evidence. We need only point out that the pre-trial order specifically cited the statutes in question as being at issue in the case, that the jury was preliminarily instructed that the County was being charged with negligence in its failure to abide by certain statutes, and that the County itself elicited testimony as to the duties of the highway engineer. Further, the bulk of Briggs' evidence went to show the failure of the County to place and maintain the proper signs at this intersection, which is at least indirect evidence of failure by the County and the highway engineer to comply with the statutes. The issue was clearly before the jury, and the instruction was properly given.

The next instruction challenged by the County was Instruction No. 10, which provided as follows:

> "You are instructed that at the time of the accident herein complained of, a statute of the State of Indiana insofar as pertinent provided as follows:
>
> > 'Local authorities, in their respective jurisdictions, *shall place and maintain* such traffic control devices upon highways under their jurisdiction. . . . as they may deem necessary . . . to regulate, warn, or guide traffic. All such traffic control devices hereafter erected shall conform to the state manual and specifications.'
>
> If you find from a preponderance of the evidence that the defendant County undertook to erect such a sign, then I instruct you that it was their duty to exercise reasonable care to maintain, repair and/or replace said sign and

if you find the defendant county failed to do so, then you may find the said defendant negligent." (Our emphasis.)

The same objections are raised here as were raised against Instruction No. 9.

The County's assertion that such instruction amounts to a negligence per se instruction is erroneous for the same reasons that are set out above. The instruction states the standard (i.e., failure to exercise reasonable care to maintain, repair and/or repace said sign) that must be breached by the County in order for it to be held liable. There is no use of the term "violated" as was condemned in the *Klepinger* case, nor does the instruction imply that the only question to be decided is whether or not a sign was present at the time of the accident.

The County contends that the statute is purely discretionary, and as such no duty is created by it. We note once again that it is uncontroverted that signs had been placed at this intersection on various dates at least two years prior to the accident. That being so, the statute, wherein it provides "shall place and maintain," is no longer discretionary in character, but creates a duty on the part of the County to reasonably maintain those signs that it has in the past determined should be placed at the various intersections. See Part VI, *infra*. This instruction merely informs the jury as to the standard that must be met by the County in order to avoid liability for breach of its duty to maintain and repair traffic control signs.

We also hold that the instruction is a correct statement of the law under the rule of *Snyder* v. *Mouser, supra,* that if one undertakes to do a discretionary act, the performance of the act is a purely ministerial function, and for negligence in such performance that results in injury, there may be liability for damages. Having decided to place a sign at the intersection, the County had a duty to maintain the sign until such time as it exercises

further discretion to remove or replace the sign with a more appropriate one, (assuming the intersection was not an inherently dangerous one to begin with. See Part VI, *infra*).

Finally, the quoted statute was correctly applied to the facts of the case, and was relevant to the determination of the County's liability. We do not believe that it confused or misled the jury, and thus find no error in its tender to them.

The last instruction challenged by the County was Instruction No. 14:

"The defendant county is chargeable with notice of dangerous, unsafe or hazardous conditions on its highways caused by the absence of previously erected warning signs where these conditions are of such a nature that the County authorities or their agents could, in the exercise of reasonable diligence, have ascertained their existence and corrected them."

The County claims that said instruction: does not state the law correctly; invades the province of the jury; is confusing and misleading; is mandatory; and instructs the jury on an issue on which there was no evidence, i.e, the purported dangerous condition of the subject intersection.

We believe the County is correct when it argues that in order to be held liable for a dangerous defect or condition, it must have knowledge, either actual or constructive, of the dangerous, unsafe, or hazardous condition. This court, in *Gilson* v. *City of Anderson* (1967), 141 Ind. App. 180, 226 N.E.2d 921, held as follows:

"In order to hold a municipality liable in such a case, it must be shown that the municipality had notice of the condition or defect which was the proximate cause of the injury complained of. See *City of Evansville* v. *Behme*, (1912) 49 Ind. App. 448, 97 N.E. 565.
Therefore, we must determine whether it could have had implied or constructive notice. As stated in the case of *City of New Albany* v. *Slattery*, (1920) 72 Ind. App. 503, 508, 124 N.E. 755;
'In cases like the one before us, it is well settled in this state that the complaining party must not only prove

that the alleged defective condition existed, but that the city had knowledge thereof, actual or constructive, long enough before the accident to repair the defect, and failed to do so. The rule of constructive knowledge applies only to such defects as might have been discovered by the exercise of ordinary care and diligence.' " 141 Ind. App. at 184.

Having determined that this is the law, it follows that Briggs was entitled to an instruction on what constituted constructive notice to the County.

The instruction in question basically told the jury that the County has constructive notice of a dangerous intersection when the conditions are such that the County authorties or their agents could have discovered the dangerous condition had they used reasonable diligence. This is the same rule for constructive notice that was stated in the *City of New Albany* case, *supra*. The clause that narrowed the instruction even further ("caused by the absence of previously erected warning signs") could have only worked to the benefit of the County, since the instruction provided that constructive notice would be applicable only if the dangerous condition that should have been discovered was the absence of warning signs. The County was not charged with a possible constructive notice of any other dangerous conditions that might have existed, such as gravel on the roadway, et cetera. Instruction No. 14 correctly stated the law.

The County contends that the instruction invaded the province of the jury, but such objection is not proper here. The jury was not told that the intersection in question was dangerous, or that lack of signs would make any intersection dangerous. They were simply told that if an intersection is dangerous because of a lack of signs, and that condition could have been discovered had the County used reasonable diligence, then the County is chargeable with constructive notice whether it had actual notice or not. The instruction simply told the jury what kind of notice was necessary in this case to hold the County liable.

While the instruction could possibly be confusing to the average juror, it is not any more confusing than many of the other Pattern Jury Instructions on negligence, and on the whole is certainly not misleading as to the issues in this case. We find no basis for this objection.

A mandatory instruction is one in which there is an attempt to set out certain facts upon which the jury is directed to reach a certain result. *Perry* v. *Goss, supra.* Here, no facts are set out such that the jury is directed to reach a certain result because of a finding of those facts. Even if an instruction is mandatory, that is not necessarily bad, *Perry* v. *Goss, supra.* The County has not favored us with any explanation as to the prejudicial effect of this allegedly mandatory instruction, and thus no error is presented.

Finally, the County contends that there was no evidence as to the dangerous condition of the intersection here involved, and thus the jury was instructed on issues that were not contained within the case. While Briggs' witnesses never said explicitly that the intersection was dangerous, the issue was certainly before them, as Briggs himself testified to the lack of signs as he approached the intersection and the wreck that resulted when he was unable to stop before running off the road and into the ditch.

The County continually makes note of the fact that Briggs never testified that the lack of a warning sign was the cause of the accident. Such contention is clearly frivolous —all reasonable inferences that can be drawn from the facts are also to be considered by the jury. See Part VI, *infra.* The instruction was properly tendered.

### III.

The next issue to be considered is whether an instruction on sudden emergency was properly tendered to the jury. There

are several requirements that must be met before an instruction on sudden emergency should be given:

(1) The appearance of danger or peril must have been so imminent that the actor had no time to deliberate or choose the best course of action in a reasonable manner.

(2) The actor must be aware that he is in peril. If the actor has no knowledge of his peril until after he is injured, then the doctrine of sudden emergency is not available to him.

(3) The situation relied upon to excuse any failure to exercise legal care was not created by the actor's own negligence.

(4) The actor's conduct under the circumstances must meet the standard of an ordinarily prudent man under like or similar circumstances.

*See Bundy* v. *Ambulance Indianapolis Dispatch, Inc.* (1973), 158 Ind. App. 99, 301 N.E.2d 791.

The County contends that Briggs was at no time conscious of any peril, and that no conduct by him was prompted by any sudden realization of danger. This contention was based on the testimony of Briggs, which was in part as follows:

"Well, I was riding north on my motorcycle between 40 and 45 miles an hour looking and watching for a cross street that ran off to the right that fitted the description she'd given me, and I came up over the crest of a short hill and there was no more road. It didn't continue straight and there was nothing I could do. I just put my brakes on and the next thing I knew I woke up in the hospital next morning."

Initially, it is clear that Briggs was conscious of his peril from the time he came over the slight rise until after he left the roadway. It is also obvious that he was not aware of the situation for a sufficient length of time so as to allow us to infer that he had the opportunity to deliberate and choose the best course of action. Thus, the remaining question is whether he became aware of the danger at a time when there were alternative courses of action available to

him so that the instruction on sudden emergency was available to excuse any alleged contributory negligence.

In *Bundy* v. *Ambulance Indianapolis Dispatch, Inc., supra,* this court held that it was error to refuse an instruction on sudden emergency where a victim was warned of an approaching vehicle at a time when he was only six feet from the vehicle that was about to back over him.

Here, Briggs had a short period of time in which to decide whether he wanted to attempt to turn to the left, attempt to "lay down" the cycle, or attempt to drive straight through the gravel and then brake before the end of the road. There was clearly an option open to Briggs, even if it was only deciding whether to apply the brakes while driving through the gravel. Briggs testified that he purposely steered straight through the pile of loose gravel and off the end of the road. It is apparent that Briggs' actions were motivated by a true sudden emergency.

We might also note here that we find no requirement that the actor know of the alternatives available to him. If the actor was aware of the emergency, and had to choose a course of conduct without time for deliberation, the instruction would still be appropriate although the actor did not know that a better course of action was in fact available to him.

The County would have us consider only the above quoted testimony of Briggs, but we must consider all of the circumstances to determine whether the issue should be submitted to the jury. Briggs was asked on cross-examination whether he was familiar with the maneuver of "cornering" or "laying down" a motorcycle. This was a clear suggestion to the jury that alternative courses of action might have been more appropriate. Further, the jury was instructed to consider the possible contributory negligence of Briggs in failing to stop the cycle, and in failing to turn to the left before he reached the end of the road.

They were presented with evidence that there were no skid marks on the road, implying that Briggs did not properly apply his brakes. We must agree with Briggs that we cannot imagine a situation in which an instruction on sudden emergency would be more appropriate.

The County contends in the alternative that the emergency situation arose as a result of Briggs' own negligent acts. We have determined that Briggs was not negligent in this case (for reasons that we discuss more fully in Part VI, *infra*) and thus find no basis for this contention.

The County also challenges the actual wording of the sudden emergency instruction. We have carefully considered the County's objection, and find no merit to it. In view of the fact that this same instruction has previously been approved by our courts in the case of *Taylor* v. *Fitzpatrick* (1956), 235 Ind 238, 132 N.E. 2d 919, we see no need to set out the complete instruction and the objections thereto.

We find that the jury was properly instructed on the issue of sudden emergency. There was no error.

## IV.

The County next contends that the trial court committed an uncorrected error of law, denied the County a fair trial, and abused its discretion when it admitted into evidence Briggs' exhibits 15, 17, 19 and 21 (posed night photographs), because (1) they were cumulative evidence bearing upon light conditions that should have been brought out in Briggs' case in chief and thus they constituted improper rebuttal testimony; (2) they were irrelevant and immaterial; (3) they were prejudicial; and (4) they were inadmissible because they were posed night photos.

We have determined that only one issue has been preserved for our consideration on appeal, i.e., whether these photos constituted improper rebuttal testimony. Ind. Rules of Procedure, Trial Rule 59 provides, in part, as follows:

"(B) Form of motion. A motion to correct error shall state the issues upon which error is claimed, but the issues are not required to be stated under or in the language of the reasons allowed by these rules, by statute or by other law. *The statement of claimed errors shall be specific rather than general, and shall be accompanied by a statement of the facts and grounds upon which the errors are based.*

"(G) Motion to correct error a condition to appeal. In all cases in which a motion to correct errors is the appropriate procedure preliminary to an appeal, *such motion shall separately specify as grounds therefor each error relied upon however and whenever arising up to the time of filing such motion.* Issues which could be raised upon a motion to correct errors may be considered upon appeal only when included in the motion to correct errors filed with the trial court. . . ." (Our emphasis.)

The only reference to these photographs in the County's Motion to Correct Errors reads as follows:

"1. Denial of a fair trial by an irregularity in the proceedings of the Court and/or abuse of discretion in that the Court admitted into evidence the plaintiff's exhibits No. 15, 17, 19, 21 and 23 (night photographs of the accident scene), over the defendants' objections, and the same constitutes improper rebuttal testimony which should have been presented as part of the plaintiff's case in chief;"

The County contends the phrase "over the defendants' objections" properly preserved the other alleged errors, since those other errors were properly brought to the attention of the trial court by means of oral objection. We cannot agree. The language does not fulfill the above stated requirement that the claimed error be "specific rather than general," nor is the motion to correct errors accompanied by a "statement of the facts and grounds upon which the errors are based." Further, by specifically listing only one ground as the basis for error the County seemed to have impliedly waived any other grounds that were not listed. The only reasonable interpretation that the trial court could give to this clause is that the County chose to waive all but the improper rebuttal argument. That being

the case, only that one alleged error was presented to the trial court, and consequently only that error can be considered on appeal.

The County relies upon two cases that it claims relaxed the strict requirements of TR. 59: *Leist* v. *Auto Owners Insurance Co.* (1974), 160 Ind. App. 322, 311 N.E.2d 828; *Indiana Department of State Revenue* v. *Frank Purcell Walnut Lumber Co.* (1972), 152 Ind. App. 122, 282 N.E.2d 336. In both cases, however, this court held that an inadequate motion to correct errors had been cured by the accompanying memorandum filed in support of the motion. In the case at bar, no such supporting documents were filed by the County. We are thus forced to conclude that all other alleged errors have been waived in the trial court and are not before us on appeal. *Freeman* v. *Freeman* (1973), 159 Ind. App. 98, 304 N.E. d 865.

The one remaining issue properly preserved is whether the admission of these photographs into evidence constituted improper rebuttal evidence on the part of Briggs. We first note that the order of the admission of evidence at trial is a matter that is within the sound discretion of the trial court. This court will review the matter only to determine whether an abuse of that discretion has occurred. *Waugaman* v. *Gary Methodist Hosp.* (1972), 151 Ind. App. 279, 279 N.E.2d 240.

The rule in regard to the order of proof was stated in the case of *Indianapolis Transit, Inc.* v. *Moorman* (1963), 134 Ind. App. 572, 189 N.E.2d 111, and quoted again in *Waugaman* v. *Gary Methodist Hosp.*, *supra*, as follows:

"The question whether the evidence upon which the cause was submitted was introduced in orderly sequence is not so important as the question whether it was competent for the purpose of leading the jury to a just conclusion upon the issue on trial. To warrant a reversal for the admission of evidence out of its proper order, even for the admitting in rebuttal of evidence which should have

been offered in plaintiff's case in chief, there should appear to have been an abuse of the trial court's discretion tending to defeat the ends of justice. *Stewart* v. *Smith* (1887), 111 Ind. 526, 13 N.E. 48; *Wines* v. *State Bank of Hamilton* (1899), 22 Ind. App. 114, 53 N.E. 389; *Baldwin* v. *Threlkeld* (1893), 8 Ind. App. 312, 34 N.E. 851; *The Noblesville Gas and Improvement Company* v. *Teter* (1891), 1 Ind. App. 322, 27 N.E. 635." 134 Ind. App. at 577.

It is also the rule that if the trial court refuses to allow improper rebuttal evidence, this court will not reverse the trial court's decision in the absence of a showing of an abuse of discretion. *Waugaman* v. *Gary Methodist Hosp.*, *supra*.

In the case at bar, the trial court decided to admit the evidence, and thus the burden is cast upon the County to show that the trial court abused its discretion in allowing this evidence to be presented to the jury.

In an early case, strikingly similar to the one at bar, our Supreme Court stated:

"The last point made by counsel for appellant is that the court committed error in permitting the appellee to introduce evidence in rebuttal showing the condition of the bridge and abutments some time before and at the time of the injury.

"As the appellant had introduced evidence as part of its defense tending to show that the abutments and bridge were in proper condition at and shortly before the injury, we think the evidence introduced in rebuttal was competent, and that it was not necessarily a part of plaintiff's original case. It is true, the appellee introduced some evidence as part of his original case tending to show the imperfect and unsafe condition of the bridge, but this did not preclude him from introducing evidence tending to rebut the appellant's evidence on particular points, which tended to show that the bridge and abutments were safe." *The Bedford, Springville, Owensburg and Bloomfield Railroad Co.* v. *Rainbolt* (1884), 99 Ind. 551.

Here, Briggs testified that it was dark, there were no signs, and when he came over a small hill, he saw that the road

ended abruptly up ahead. The County submitted evidence to the effect that when one approached the intersection, there were no obstructions to the view, and one could see the road end up ahead because of the large amounts of foliage that indicated that the road did not continue straight ahead. The trial court held that Briggs was entitled to rebut this evidence with photographs that showed that this foliage was not visible at night, and that in fact, there was no way to tell that the road did not continue straight ahead. The County had ample opportunity to offer its own evidence in surrebuttal. We cannot say that the trial court abused its discretion in admitting this evidence.

## V.

The next issue presented is whether the trial court erroneously denied the County's motions for judgment on the evidence.

The test used to decide whether to grant a motion for judgment on the evidence at the close of plaintiff's case in chief is the same test that is applied when a motion for judgment on the evidence is made at the close of all of the evidence. Rule TR. 50; *Merorial Hospital of South Bend, Inc.* v. *Scott* (1972), Ind. App., 290 N.E.2d 80. Any error in the ruling on the motion for judgment on the evidence at the close of plaintiff's case in chief is deemed corrected by evidence subsequently offered or admitted if the evidence as a whole is sufficient to withstand the motion. Rule TR. 59(A); *Hendrickson & Sons Motor Co.* v. *Osha* (1975), 165 Ind. App. 185, 331 N.E.2d 743 (petition for transfer pending.)

The test to determine whether a Rule TR. 50 motion for judgment on the evidence should be granted is the same test that is applied to determine whether a Rule TR. 59 (E) motion should be granted after a verdict has been rendered and a motion to correct errors has

been filed. *Miller* v. *Griesel* (1973), Ind. App., 297 N.E.2d 463, reversed on other grounds but affirmed as to this issue, *Miller* v. *Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701. *But see Mamula* v. *Ford Motor Company* (1971), 150 Ind. App. 179, 275 N.E.2d 849. Thus, this court need only determine that the judgment below is supported by sufficient evidence as to each element of the cause of action. When this test is satisfied, we can affirm the trial court's findings as to both the Rule TR. 50 error and the Rule TR. 59 error raised in the motion to correct errors. Therefore, a detemination of the sufficiency of the evidence issue under the next assignment of error will of necessity decide the issue here presented as to the propriety of the denial of the motions for judgment on the evidence, and we need make no separate inquiry as to that issue at this point.

## VI.

The County alleges that the jury's verdict was contrary to law, contrary to the evidence and was not supported by sufficient evidence because (1) Briggs failed to establish that the County owed any duty to him; (2) Briggs failed to establish a breach of duty, if any; (3) Briggs failed to establish that the breach of duty, if any, was the proximate cause of his injuries; and (4) Briggs was contributorily negligent as a matter of law.

In *Miller* v. *Griesel* (1974), 261 Ind. 604, 308 N.E.2d 701, the Indiana Supreme Court held that before a trial court may submit a negligence case to the jury, the court must resolve three questions of law. These three questions of law were defined by the Supreme Court thusly:

> "There are three questions of law to be decided by the trial court concerning these elements before it may submit the case to the jury. The first is whether the law recognizes any obligation on the part of a particular defendant to conform his conduct to a certain standard for the benefit of the plainitff.

" 'The duty to exercise care for the safety of another arises as a matter of law out of some relation existing between the parties, and it is the province of the court to determine whether such a relation gives rise to such duty.'

\* \* \*

"The second question of law concerns what standard of care will the courts impose on this relationship once a duty is recognized. The traditional standard to be applied is whether the defendants exercised their duty with the level of care that an ordinary prudent person would under the circumstances. *Pierce* v. *Horvath* (1968), 142 Ind. App. 278, 233 N.E.2d 811. . . .

\* \* \*

"The third question of law for the court here is one which courts must pass upon in every civil case; that is whether the evidence introduced by the plaintiff at trial is sufficient as a matter of law to enable the jury to find that the plaintiff has established the elements of the cause of action; in this case the elements of negligence outlined above. . . ." 261 Ind. at 611, 612, 308 N.E.2d at 706.

Thus, the first inquiry is whether the County owed any duty to Briggs.

We have already determined, in Part II, *supra,* that the relevant statutes of this state create no absolute duty so that a violation of the statutes constitutes negligence per se. Thus, if there is any duty owed by the County in this case, it must be the common law duty to use reasonable care under all of the circumstances. *Board of Commissioners of Miami County* v. *Klepinger, supra.*

It seems clear that there is a duty on the part of the County to protect the users of its highways from inherently dangerous conditions existing on those highways if the County has either actual or constructive notice of that danger. This is evident from the facts of the *Campbell* case, Part I, *supra.* Thus, if Briggs has shown that the intersection in question was an inherently dangerous intersection, and that the County had constructive notice thereof, as we believe he has, then he can hold the County

liable for failure to use reasonable care to maintain the intersection, if that failure was the proximate cause of his injury and he was not contributorily negligent.

However, even if the intersection in question was not conclusively shown to be inherently dangerous, we still believe that a duty arose on the part of the County to maintain and repair any signs that it had previously determined should be placed at the intersection. If it is not clear that the intersection was inherently dangerous, but the County had previously placed warning signs there, proof of the fact that the intersection was not dangerous would more appropriately go to show that the County's failure to properly maintain the signs was not the proximate cause of the injury, rather than to show lack of duty on the part of the County to maintain those signs it had previously erected and the public had come to rely on. The jury will decide the issue of liability by determining whether the negligent maintenance of the sign was the proximate cause of the injury.

In summary, a duty on the part of the County to use reasonable care in maintaining its streets and highways will arise whenever it can be shown that an intersection is inherently dangerous because of the absence of a warning sign, or when it can be shown that the County has foreclosed the issue of inherent danger by failing to maintain a sign that had previously been placed at the intersection.

We therefore conclude in the case at bar that under either theory, a duty arose on the part of the County to use reasonable care to protect Briggs from injuries caused by the County's negligence in failing to properly repair and maintain county highways.

Having found a duty owed by the County to Briggs, the next question concerns what standard of care the courts will impose on the County in meeting its duty to Briggs. All sides agree that the standard to be applied is whether the County exercised its duty

with that level of care that an ordinary prudent person would under the circumstances.

The third question of law for the court to decide is whether the evidence is sufficient as a matter of law to enable the jury to find that Briggs has established the elements of his cause of action in negligence. We have determined that the County owed a duty to Briggs, but the remaining issues of breach of duty and proximate cause are questions for the jury, and we need only determine here whether the jury's decision is supported by sufficient evidence as to each issue.

The County contends that Briggs must show that the County had actual or constructive knowledge of the absence of the sign in question, and that Briggs has failed to do this in light of the County's evidence that no such notice reached the County. Members of the County Highway Department and other County administrators all testified that they had received no actual notice of the absence of the warning signs. Additionally, the two members of the sign crew both testified as to their routine inspection tours and efforts to discover missing or damaged signs, and further testified that the signs in question were present at the time of one such inspection the day before the accident. Thus, the County claims there was no actual or constructive knowledge of the defect.

We have already determined in Part II, *supra,* that actual or constructive knowledge of the defect was necessary to hold the County liable. In attempting to show the County's constructive knowledge of the defect, Briggs introduced evidence which showed that the signs in question had been down for at least a month before the accident, and as a result, the County's claims notwithstanding, Briggs claims there was constructive knowledge on the part of the County, since the defects should have been discovered by the exercise of ordinary care and diligence.

Witness Ed Coates testified that he had observed a warning sign on the approach to the intersection, but it had been gone

for at least a month. Witness Roxanne Flannery testified she had gone though the intersection many times in the five to six weeks preceding the accident, and had never seen a warning sign. In view of the fact that the County's witnesses gave conflicting accounts as to the presence of many different kinds of signs the day before the accident, we cannot say that the jury's verdict is not supported by sufficient evidence, or is contrary to law. The jury is the only judge of the credibility of the witnesses, and their determination will not be disturbed on appeal.

As to the issue of proximate cause, the County contends that Briggs has only shown that a sign was missing and that an injury occurred. While it is true that mere proof of a missing sign and proof that an accident took place would not in itself show proximate cause, see *Haney* v. *Meyer* (1966), 139 Ind. App. 663, 215 N.E.2d 886, we do have more than that to rely on in the case at bar. Here, Briggs testified extensively as to the circumstances and events that led up to the accident. While he may not have stated in so many words that the absence of the sign caused his injury, such a conclusion is the clear import of his testimony, and the determination of the jury to this effect is clearly supported by sufficient evidence.

Finally, the County contends that Briggs was contributorily negligent. Since the burden was on the County to prove such contributory negligence in the court below, the failure of the jury to find for the County constitutes a negative judgment. Consequently, the County must show that Briggs was guilty of contributory negligence as a matter of law. Only where the facts are undisputed and where a single inference can be drawn from the facts will the court say, as a matter of law, that certain facts constitute contributory negligence. *Dreibelbis* v. *Bennett* (1974), 162 Ind. App. 414, 319 N.E.2d 634; *Baker* v. *Fisher* (1972), 153 Ind. App. 581, 288 N.E.2d 263, transfer denied (1973), 260 Ind. 513, 296 N.E.2d 882.

The County contends that Briggs was contributorily negligent as a matter of law under the rule of *Dwyer* v. *Christensen* (1956), 76 S.D. 201, 75 N.W.2d 650, which held that contributory negligence may be presumed from the fact that a driver cannot stop within the range of his headlights. We note initially that it was never shown in the trial court that Briggs would have been unable to stop within the range of his headlights. It is entirely possible that the jury concluded that he would have been able to stop had it not been for the loose gravel in the middle of the intersection.

In any event, we have determined that the rule of *Dwyer* v. *Christensen* does not apply in Indiana. It has long been our rule that negligence, with respect to speed and the visibility of objects on the road ahead, is a question of fact for the jury to consider in light of all of the circumstances. *Opple* v. *Ray* (1935), 208 Ind. 450, 195 N.E. 81. See also *Schlarb* v. *Henderson* (1936), 211 Ind. 1, 4 N.E. 2d 205. Even if we could conclude that Briggs had outdriven the range of his headlights, we still could not say that he was negligent as a matter of law, since a consideration of all of the other circumstances might enable a jury to conclude that Briggs was not negligent. We believe such an interpretation is warranted here.

Briggs was driving down a country road looking for a turn-off to the right. His rate of speed was substantially under the speed limit, and his lights were on low beam in order to see the dips, ruts, holes and bumps in the road up ahead. It was a dark, cloudy night, and there were no signs or other warnings that the road curved up ahead. Just after he came over the slight rise, he realized the road did not continue straight ahead. As he put on his brakes, he hit a large patch of gravel in the roadway, and consciously drove straight through it. He was unable to stop before he ran off the edge of the road and crashed into a fence and some small trees by the ditch.

We cannot say that the above facts, and the inferences to be drawn therefrom, lead to only one conclusion on the issue of contributory negligence. That being the case, the jury's verdict will not be disturbed on appeal.

## VII.

Finally, the County contends that the award by the jury of $50,000 damages should be reversed and a remittitur ordered since the damages are clearly excessive under the evidence presented to the trial court.

Several comments have been made in recent cases on the issue of excessive damages. In *Chicago, South Shore & South Bend Railroad* v. *Brown* (1974), 162 Ind. App. 493, 320 N.E. 2d 809, Judge Hoffman of this court, quoting from various sources, summarized the law as follows (citations omitted):

> "On the question of excessive damages in order to justify a reversal on such ground, the amount of damages assessed must appear to be so outrageous as to impress the court at 'first blush' with its enormity.
>
> &ast; &ast; &ast;
>
> "In order to justify a reversal on grounds of excessive damages, the amount of damages assessed must appear to be so outrageous as to impress the court as being motivated by passion, prejudice and partiality.
>
> &ast; &ast; &ast;
>
> "Reversal is not justified, however, if the amount of damages awarded is within the scope of the evidence before the court.
>
> &ast; &ast; &ast;
>
> "Broadly stated the person injured by the negligence of another is entitled to reasonable compensation. Courts have said that term means such sum as would reasonably compensate him for bodily injuries, for pain and suffering. To that sum shall be added past, present, and future expenses reasonably necessary or incidental to the plaintiff's effort to alleviate his injuries and all pecuniary losses suffered, or to be suffered, as a result of inability to engage in his usual occupation. Compensation is the stated goal of a court when measuring damages for personal injuries. . . ,
>
> &ast; &ast; &ast;

"By nature, injuries personal to the individual, are incapable of a more definite rule for measurement of damages. Each action is unique and it must be so treated and determined on the facts peculiar to that matter. Because our law seeks to individualize the solution to the problem of properly compensating the victim of torts, no overall expedient applies in every case.

"For a formula then, our common law sets only the general guidelines for compensating the victim, each in its own way to be considered by the trier of facts and weighed to determine what the total compensation will be. Because of this personal nature of each case and since the decision is unique to the particular set of facts our courts have said the trier of facts is to be given 'sound discretion,' and 'liberal discretion' where damages cannot be defined and calculated with mathematical certainty or by any exact standard."

In this case, Briggs sustained serious injuries, including a fracture of the pelvis, internal bleeding requiring three transfusions, a broken back, and multiple cuts, bruises, and lacerations. He was hospitalized for ten days, confined to his bed at home for another month, and allowed up and around after that only when using a back brace, which he still uses on certain occasions. He testified that his back ached constantly, he had to hold his back rigid, and he could only sit in a straight back chair. A great number of his usual activities had to be curtailed, including sports, outdoor recreation, weight lifting, and other activities. His doctor testified that the injury would most likely become more painful in the future, especially if he engaged in any extra exertion; and that eventually a spinal fusion operation may be necessary to relieve the pain. We cannot say that the damages awarded are so outrageous as to impress the court at "first blush" with its enormity, nor can we say that they are so outrageous that this court believes the award was motivated by passion, prejudice, or partiality. On the contrary, the amount of damages awarded is within the scope of the evidence before the court, and no error is shown.

## CONCLUSION

Finding no error, the judgment of the trial court is affirmed.

Robertson, C.J. and Lybrook, J., concur.

NOTE.—Reported at 337 N.E.2d 852.